When the Supreme Court defined the contours of the 14th Amendment's special relationship cause of action before you today in Descheny v. Winnebago County, it explained the reasoning for it this way. When the state, by the affirmative exercise of its power, so restrains an individual's liberty that it renders them unable to care for themselves and at the same time fails to provide for basic human needs, it transgresses the substantive limits on state action set by the Due Process Clause. The affirmative duty to protect arises from the limitation which the state has imposed on a person's freedom to act on their own behalf. That is exactly the case here. Okay, so just, the briefing was a little unclear, but your argument now seems consistent with what you said on your reply brief, page 7. There is no dispute of facts here. It's only about the contours of the special relation concept. So your argument for reversal, you're placing your arguments inside the special relations test. That is correct, yes. The reason that's exactly the case here is because Fort Bend County affirmatively took complete control of OFMA Odadiah's medical care and person down to the very air that she breathed and failed to care for her serious and obvious medical needs. With that in mind, appellants will present two points. First is that both DeShaney and this court's decision in MD v. Abbott confirm that Fort Bend County formed a special relationship with OFMA by their actions, making it and the individuals responsible liable under the 14th Amendment in Section 1983. Second point is that DeShaney's reasoning includes prison and detainee cases so inextricably that the entire class of cases must apply here. And under those cases, appellee's actions are undoubtedly in violation of OFMA's clearly established 14th Amendment rights. Part of the difficulties is the 28J, which was helpful. The first paragraph cites Allen. Allen is a detention case. They shot and handcuffed the guy. And then the case that seemed to me most apt was the Sixth Circuit Jackson case. That's an ambulance case. But I'm going to quote for why they said DeShaney's special relation doesn't exist. Quote, the EMTs did nothing to restrain the decedent. They didn't cause the decedent to be shot, render him unconscious, or handcuff him. So here, it's a voluntary 911 call. They do show up, maybe gross negligence, but they don't handcuff, they don't shoot. It's just a big step to say putting someone into an ambulance that they called and requested is detention. So I have two responses. The first is that in terms of the Sixth Circuit ambulance case, like you said, the reason that it wasn't considered detention was in part because the plaintiff fell unconscious before they were put into the ambulance. That's not the case here. All the family was still alive, was still breathing, and had her care taken over by Fort Bend County. And that's my second point, which is- Right, but that, I'm just going to, that's worse because then at any point, theoretically, the family and the patient could say, we'll take our, we'll drive ourselves. No one is restraining her. That's where I disagree. Okay. Where Fort Bend County exercised their affirmative control, well, excuse me, where Fort Bend County demonstrated their affirmative control over her care and over her person, we can see it in a few places. First, they made her get up and walk to the stretcher where she vomited twice. Second, they replaced her nasal cannula and her oxygen take with their own and controlled the flow rate. Even though she was gasping for air and clearly needed more, they also excluded the family's information and provision of care and excluded them from the ambulance. And by the time that they got her into the ambulance and started performing chest compressions, she was then contained within that ambulance, could not leave on her own, and was still not being brought to the hospital immediately and was not defibrillated as well. So we have those demonstrations that exercise, again, both control of the person and control of the medical care. And the reason that control of the medical care is relevant is because we can look at DeShaney, and just as Brendan said, he has a quote about Youngberg. So Youngberg and Estelle are the two bases from which DeShaney pulls this special relationship doctrine. It really draws a through line through other cases that come from the 70s and the 80s that define this right, and DeShaney just distilled those. But the right has existed since that point. And in Justice Brendan's dissent, he noted that Youngberg, the liability due to hospitalization came from the fact that the hospitalization separated the plaintiff from other sources of aid that the Supreme Court held the state was obligated to replace. Again, here we have the ambulance showing up, removing Olufemi from the care of her family, from the only other source of aid that she had available to her in the immediate context of her medical emergency, and taking over that care themselves. And MD reflects that to an extent, because it not only incorporates this exact reason that we're talking about in DeShaney by quoting it directly, and as a side note to that, appellees make a big point about the four examples of categories of individuals that do form a special relationship. That has never been an exclusive list. Those are examples that are in DeShaney of cases where- Do you agree, though, our court is the most restrictive in its interpretation of all of the two DeShaney exceptions? I don't know. I wouldn't agree that it's the most restrictive. I would agree that it is among the most restrictive, but it still has not said definitively anywhere that appellants can find, even at MD, that this is the only set of cases, this is the only set of persons to whom this special relationship applies. That just simply doesn't exist anywhere. And MD goes on- To the extent you'd expand it, what exactly is this next category? It involves all government EMS services when they do what? In other words, relief for gross negligence may still exist under state tort law, but you're saying there's a constitutional violation when an ambulance driver does what? Holds the person in custody? So when the state exercises control through taking exclusive care of- But isn't that every ambulance driver? As soon as they shut the doors, they are, under your theory, they're in custody. So every single ambulance, transportation. So yes, but the reason that that is not too broad of a rule is twofold. First is that not every ambulance is a state ambulance. We're only talking about state-run EMS services here. And second, generally speaking, ambulances turn on their lights and go straight to the hospital. There's not room for this sort of deliberate indifference, and even if there was, it's self-contained in a vehicle in which there often aren't other people. Sometimes there are, and sometimes you can maybe take those person's experiences or records of the EMS personnel's experience and draw deliberate indifference from that. But that is an extremely rare case. The reason that this case is able to exist in the way that it does is because we have 32 minutes from the time they arrived. That's in addition to the 17 minutes it took them to arrive in the first place. We have 32 minutes from the time that they arrived till the time that they closed the ambulance and left. And in the time that they were there and exercised control over her medical care and over the person, we can see that the deliberate indifference occurred at that point. So, just because there is a risk of... Okay, so you're identifying the constitutional violation as before they have her in the car and closed the doors. It's what happened there where she's still with her family. Yes. But that's a little in tension with the requirement of sort of custody and confinement. So, Your Honor, I would argue that the test is not... So, the crux of it has to be that they asked her to walk and that her tank was disconnected in favor of a nasal can. Would you agree those are the two salient? Yeah, those are the two most salient points, yes. And the test, as appellants understand it, is not detainment in the traditional sense of the word in the, you know, restricting somebody's physical movement sense of the word. It's more to do with the assertion of state control over a person. In this case, again, her person itself, I mean, she wasn't physically restrained, but she was required to follow the directions and act and even breathe per the requirements of the state employees, the EMS service. So, although she wasn't in handcuffs or anything like that, and in theory, maybe if she could walk under her own power, which she couldn't, got up and left, it would be different. But that's not... Those aren't the facts we have here. The facts we have here is she could barely walk. She could barely walk from her wheelchair to the stretcher without vomiting twice. She couldn't have left under her own power. But why was she required to walk from the wheelchair to the handplants? That's something that we will... That we need discovery to find out more as to the... I guess my question is, why do you feel like she was required to do that? Even if they asked her to do that in order to receive the services, why... What is your argument as to why she was required to follow their direction? So, the reason that I use the word required to follow their directions at that point is, OFME's only option at that point was to get to the hospital as quickly as possible and receive the best care possible. And the EMS personnel, the only way that they would treat her and would do that is by making her get up and walk. Why they subjectively decided to make her get up and walk, I don't know that I can speculate on that specifically. But, the idea that she was required to get up and walk comes from the fact that the only way, in her understanding and the family's understanding, that she could proceed with acquiring the care that she needed to get was by getting up and walking and following the directions of the EMS personnel. But, to judge as one of your previous points, I also wanted to just assert the fact that this is not... a new duty on the part of the state. All we're doing is trying to follow the reasoning set forth into Cheney and MD and say that it's not new for the state to exercise this control and provide reasonable medical care when it acts affirmatively to begin providing that care exclusively in the first place. That's what the Cheney was all about. That's what MD was all about. You probably heard, and I always ask the Canadian question, what's your best circuit decision applying the Cheney special relationship to the closest amount of facts? What's the circuit you would say? That's the logic and reasoning you should follow. So, the closest appellants can get to is probably MD. Of course, that involves foster children. But, in MD, we see a lot of the same reasoning where we're taking this established doctrine at this point, this special relationship doctrine, and we're applying it to maybe a broader context than it's seen in the past. And let me just say a second question. When you just said a moment ago, you're not asking for a new test. So, in the 28J letter, in the second paragraph, where you refer to the Fisher decision, that would be a new test for a state-created danger. So, you're not asking for a new test. Correct. If this court decides that it wants to reconsider its state-created danger theory, the appellants would be happy to address that and go into that. But, as this court has indicated in the past, that would require a specific and detailed briefing on that issue. So, at the current judgment... It's not a third party that the state dropped her with, then harmed, right? Correct. In the context, your argument here is throughout, it's state actors who inflicted the injury. Correct. Okay. That's exactly correct. And that's why Apelli's reliance on De Cheney was a little bit confusing to me because De Cheney protects the state from liability against third-party harms. We're not talking about third-party harms. I was confused about that, too, but that's exactly why I asked you the first question. Your briefing and your argument to us, you have said in writing and orally, your argument depends on De Cheney. Yeah, the reasoning, De Cheney, the whole... Okay, but that's... So, now, I just want to be very clear, because this case confused me that way. I didn't see you citing De Cheney or special relationship in the complaint, but then the briefing and the argument to us has been entirely dependent on us broadening special relations to include. That is what you said, counsel, in writing and orally. Right, so... So, when you say, I don't know why they're talking about De Cheney, it's because you said your entire argument rests on De Cheney. Right, right, and I just want to address two parts of that. First is that I, again, I'm not arguing to expand De Cheney. De Cheney in and of itself, as it's defined within its reasoning, applies pretty directly here. That's the crux of our argument. Where I say I was a little bit confused by Apelli's raising of De Cheney is that the way that they're attempting to use it is to ignore the entire portion of it where it only protects the state from its inaction to protect plaintiffs from third parties' actions. So that's my only issue bringing that up. I understand why they addressed it. It's clearly very important in this case. Thank you, Your Honor. May I proceed? May I please the court? My name is Ken Kanata, and I represent Fort Bend County, Fort Bend County EMTs, Jose Diaz, and James Smalley. I think the issue that is going to be the ultimate question in this case  and do they take a patient to the hospital while acting in an emergency response capacity by providing requested and potentially life-saving emergency medical care? Now, before I get into that issue, there were a couple of issues that were raised by the plaintiffs in their briefing. One, that they claim that a duty is created because the state had already decided to provide affirmative care by dispatching EMS. De Cheney speaks right to that issue. And De Cheney says, the affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from the expressions of intent to help him, but from the limitation put on that person's freedom to act on their own behalf. And I think the court acknowledges that. Plaintiffs' second claim, that this claim alleged is a harm by the state, not private harm as contemplated by De Cheney. And we believe that claim is meritless. The harm, the private harm, is Ms. Odutayo's underlying medical condition, as admitted in their first amended complaint. They say Ms. Odutayo was having health problems at home. Ms. Odutayo was in dire need of transport to a hospital. This is a rescue case. We were there attempting to rescue her from this private harm, which was her underlying condition. Plaintiff's final argument, raised for the first time on appeal, in their principle brief and reply brief, is that there was a special relationship, which would trigger a duty to provide adequate medical care. However, given the totality of the circumstances, there's no plausible allegation of incarceration, institutionalization, or other similar restraint as required by De Cheney to create a special relationship. To the extent there was any plausible restraint alleged, the totality of the circumstances indicate that such restraint was voluntary. They called EMS. Their first amended complaint says they begged her to be put into the ambulance. So this was a voluntary restraint, if it was a restraint at all, and the court in Walton v. Alexander stated that the state owes no duty under the due process clause to protect the bodily integrity of one who is voluntarily in state custody or care. To the extent there was any alleged, any plausible restraint, such restraint was made in an emergency medical response capacity and not in a law enforcement capacity, which brings the Fourth Amendment into play. In Pena v. Givens, an unpublished opinion of this court, they cited Sixth Circuit case law for the proposition that there is no controlling authority or robust consensus of persuasive authority suggesting that medical personnel seize patients when restraining them in the course of providing treatment. The court in Pena also cites authority for the proposition that the determination of whether a seizure under the Fourth Amendment occurs should not turn on whether the government officials were police officers, but rather whether the officials acted in a law enforcement capacity or in an emergency medical response capacity. There's no plausible claim that the defendants were acting in anything other than an emergency medical response capacity. The authority you cite, the Easter decision, page 23 of your opinion, it contemplates that if, for example, the patients put in the ambulance, at which point they are confined and restrained. Absolutely. And then the drivers just decide to go to a donut shop, intentionally delay getting the patient. That would be a different case? Quite possibly that there is case law that says where the ambulance decides we're going to take you to this hospital as opposed to where you want to. That's a medical judgment, but willful and intentionally detouring, not with any justification medically. It would seem to me that could supply the confinement element. It could, but that's not the facts. It isn't the facts here. When I read your brief, I did agree. Why are we looking at this under Tichini at all? In their complaint, they cite hair and fluoresce. Those aren't Tichini cases. It isn't a third party that's inflicted injury. It would just seem to me their allegation here, characterized as in the light most favorable, and I think it's paragraph 20 of 22, is EMS show up and they disconnect somebody from oxygen. Intentional deprivation of service. And I'm looking at 22. What they said is they took her off her home oxygen and they switched her cannula to their oxygen, which is something you would expect them to do as they're ready to transport her to the hospital. So both were nasal cannula. Her camp was a nasal cannula, and then they put her on the ambulance nasal cannula. There wasn't a reduction in flow? There was a reduction in flow, as alleged, in that when they moved her, the flow wasn't the same, so they had to compensate for that, and during that time period she was gasping for air. That allegation doesn't really speak of a custody issue or a detaining issue. It's more of a conscious indifference issue, which we don't get to if there's no constitutional violation. What they're attempting to do is take a state-tort medical malpractice case and constitutionalize it solely because the defendant is a state actor, and I don't think that's what DeShaney says, nor is there any case that says that. If they were to take it to an extreme, every time you're put into an ambulance and strapped down with a gurney, you'd be technically detained, but it's a voluntary detainment because you asked for it in this case, or you're unconscious and they're acting in an emergency medical capacity. I think there's a different issue if the EMTs are acting in concert with the police. If they're acting in concert with the police, then they're acting in a different capacity. So I'm not here to tell the court that there's no instance in which an emergency medical technician couldn't be held liable in these situations. If you've got someone who's out on PCP and the cops can't run them in and they ask the EMTs to give them a shot so that they can take them into custody, and then they don't provide adequate medical care, they were detained, and the EMTs were part of that detention in that they were acting in a law enforcement capacity. I feel compelled to mention Judge Higginson, your opinion in Kelsen v. Clark because it involves EMTs. But in that case, and I'm reading from the plaintiff's briefing, I should remember all the cases I'm on, but I don't. Did you cite it in the brief? We did not. He's not just mentioning it because it was on it. It's got some relevance to this. It does. You've made, in my opinion, a really good argument already. But if you want to keep going, go right ahead. Your Honor, a good lawyer always knows when to shut up. So I'm going to do that right now. Unless you have any further questions, I would yield to my colleague. Thank you. Good morning, judges. Thank you. And I'll be brief, Judge Graves. My name is Rolf Krueger, and I have the honor and the responsibility of representing Fort Linn County Paramedic Will Chin. And very briefly, I want to talk to you about some of the policy concerns with what the plaintiffs are asking you to hold today. And as the issue, as I see it, judges, what the plaintiffs are asking you to hold today is that a patient is taken into custody for purposes of the 14th amendment when a paramedic provides requested and potentially lifesaving emergency medical care, subjecting that paramedic to unlimited damages and attorney's fees under section 1983. So again, what that question, that holding begs the question, what would the policy implications be? And I think at a minimal level, what you would see is paramedics failing to provide potentially lifesaving care that restrains a patient in any way. Mr. Cannata alluded to that a little bit during his argument. This could be something simple, like simply securing a patient to a burning during transport to the hospital, securing a patient's neck after a suspected head or neck injury, performing the Heimlich maneuver on a patient that's potentially choking and securing a patient during an epileptic seizure so they don't injure themselves. But what could be even worse than that is that many of these small counties and small cities throughout our circuit would simply not provide emergency medical care at all. Because if they do every single time, their paramedics respond to an emergency call, they could be subjected to unlimited damages and attorney's fees. This is something near and dear to my heart because my parents live in one of these small towns. And if they don't have County provided EMS services, there wouldn't be any services. The plaintiffs alludes to this in their brief is that they are legally foreclosed. If this court does not expand the 14th amendment, the judges, that's simply not true. Under section one Oh 1.0, two one two of the Texas civil practice and remedies code governmental immunity is waived with respect to personal injury or death. So caused by a condition or use of tangible, personal, real property. And Texas law has held that a defibrillator is considered personal property. We heard a lot of discussion about a nasal canola and it would follow that a nasal canola could be considered, likely would be considered personal property. Additionally, if it was alleged that my clients or other paramedics, uh, withheld emergency medical care for some type of discriminatory reason, there's also an equal protection claim available to those plaintiffs. Um, and judge Graves, your dissent and the equivalent would probably be a good roadmap for that. Um, moreover to shame addresses these concerns about being legally foreclosed, um, statings that the States may create such a system in accordance with regular lawmaking process. So for the reasons in our outline in our brief, the legal reasons, the legal reasons discussed by Mr. And for those policy reasons, we ask that you uphold judgment dismissal. And, uh, we believe that to be correct. And it's an honor of being here. If y'all have any questions on this. Thank you. Thank you. A bottle. All right, your Honor. A few points to address on rebuttal. Uh, the first, I think I'm going to go in reverse order here. So, um, speaking to, to policy issues, part of the reason that, that a policy concern is not created here on a broad scale in terms of allowing for a quote unquote, new cause of action for against County or state provided EMS services is, is twofold. First, the generalized provision of care is not the same thing as taking exclusive control of somebody's medical care. Sometimes it is. And in those cases, then that opened that, that may open a door. Uh, and that's what we see here. But the second thing that protects against that is the deliberate indifference standard. As this court has recognized time and time again, the deliberate indifference standard is extremely high. If in, in the regular course of an EMT's and EMS's duties, they're doing the things that they need to do, they're acting with the appropriate urgency, they're using the correct equipment and just generally providing care as generally understood that they should, then we have no issue. But not all cases are like this one, where we have 32 minutes from the arrival of the ambulance until the departure of the ambulance, where there was even a delay after they started chest compressions before the ambulance even left. And, um, as to opposing counsel's point about the defibrillator specifically, that was not used here, whether or not a nasal cannula would likely be considered property under the, under the Texas claims act is not, is not really all that much consolation to be honest, because there, there really is no guarantee that there is no clear path forward. My, uh, law partner and I have tried on numerous occasions to use that portion of the Texas court claims act in various situations. And to say that it's an uphill battle, that it is, I don't think in any case that I've been on has ever worked. Um, and regarding policy concerns on our end, holding that this case where the state has taken affirmative action should not apply the same standards as in the incarceration context creates two classes of treatment that citizens are, are able to expect from their government when their government takes control. And it puts anybody that is incarcerated or anybody that is subject to the control of, of the state in a formalized sense in a long-term sense and a higher position than somebody who is receiving emergency care. Um, so it, it unnecessarily bifurcates the standard of care for different classes of people,  which was not contemplated in disdain. Um, and the second thing I'd like to address about Mr. Cannata's argument, um, is first of all, MD and Ducheney both recognize that that law enforcement and formalized detention is not at all required for the special relationship theory. Um, Ducheney was a special relationship case. It didn't hold the state liable, of course, but it still was analyzed under that framework as was MD. And these are both childcare cases. This is far outside the detention context, um, far outside the law enforcement context. So law enforcement involvement, detention in the formalized sense is not, and has not been required under these, this class of cases. Um, and secondly, uh, Ducheney's, or sorry, MD specifically addressed the points about, um, receiving wards that have problems coming into the state's care. Um, and in, in addressing that, it addressed the state's argument and rejected the state's argument that because some children come into the foster care system already having been traumatized, already having to deal with mental health and physical health problems, despite that there is still an opportunity for further harm. And there's no need to measure or quantify the harm that comes from the state specifically, as opposed to what was happening before, because the state, first of all, can still cause harm and can exacerbate the harm further. And that's exactly the case here where yes, she was already having her own mental problems. That's why 911 was called, but the 32 minute delay, the reduction in airflow and making her walk exacerbated those problems greatly. Thank you. All right. Thank you. Council. The court will take this matter under advisement. That concludes the matters that are on today's oral argument document. And we are adjourned.